Filed 6/30/14  Bishop Arbors, LLC v. Meadowcreek Mutual Water Co. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| BISHOP ARBORS LLC, | |
| Plaintiff and Appellant, | E056232 |
| v. | (Super.Ct.No. SICVCV0744181) |
| MEADOWCREEK MUTUAL WATER COMPANY, INC. et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Inyo County.  David L. Devore (Judge of the Alpine Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) and William D. Palmer (Judge of the Kern Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Law Office of Michael Berger, Michael Berger and Robert S. Hanna for Plaintiff and Appellant.

David S. Baumwohl; Jacobson, Hansen, Najarian & McQuillan, Leith B. Hansen; Georgeson, Belardinelli, and Noyes, C. Russell Georgeson and Christopher B. Noyes for Defendants and Respondents.

1

# I

## INTRODUCTION

This case arises from defendant Meadowcreek Mutual Water Co. (MMWC) refusing to provide plaintiff Bishop Arbors LLC (Arbors) with water services, which Arbors needed to develop its property. Arbors originally filed a complaint against MMWC for breach of contract, based on five letters written in 2002 and 2005. Arbors amended the complaint to allege MMWC's claims were instead based on two 1997 annexation agreements (1997 Agreements) entered into between MMWC and previous owners of Arbors's property. The fifth amended complaint became the operative complaint.

Arbors appeals from summary judgment and an order sustaining a demurrer to the fourth cause of action of the fifth amended complaint, in favor of defendants MMWC and MMWC board of directors members, Andrew Holmes and James Orr (referred to collectively as defendants). The trial court determined that Arbors had no enforceable rights to water under the 1997 Agreements.

Arbors contends the trial court erred in finding there was no express assignment of the 1997 Agreements to subsequent property owners and Arbors could not enforce the 1997 Agreements because they were never recorded. Arbors also argues the trial court erred in concluding the 1997 Agreements were terminated as a matter of law and because there was a change in the intended development of Arbors's property. Arbors further asserts that the trial court erred in summarily adjudicating that Arbors failed to perform the conditions precedent, necessary for issuance of water shares under the 1997

2

Agreements, and in denying Arbors's cross-motion for summary adjudication. As to defendants' demurrer, Arbors argues the trial court erred in sustaining without leave to amend defendants' demurrer to the fourth cause of action for tortious interference with contract.

After fully reviewing the record on appeal, we conclude Arbors has failed to raise any material triable issues of fact and the trial court appropriately granted summary judgment. The trial court also correctly sustained defendants' demurrer to the fourth cause of action without leave to amend. We affirm the judgment.

II

FACTS AND PROCEDURAL BACKGROUND

The material facts are essentially undisputed. It is how they are construed as a matter of law that is at issue. The pertinent facts are as follows.

MMWC is a mutual water company formed for the sole purpose of delivering water at cost to residential property owners of the Meadowcreek subdivisions and neighboring commercial properties, contained within the express service area of MMWC. MMWC, on occasion, expanded the areas it served by entering into annexation agreements with property owners outside MMWC's express service area.

Generally, each parcel within MMWC's service area has one share of water stock appurtenant to each parcel, entitling property owners to receive water service from MMWC. MMWC permitted owners of larger parcels intended to be subdivided, to receive multiple shares, with one share provided for each anticipated lot or interest in the property. Shares of MMWC water stock confer water rights which run with the

3

appurtenant property located within the designated MMWC service area and annexed parcels adjacent to and near the Meadowcreek subdivisions.

*The 1997 Annexation Agreements*

In 1997, MMWC's attorney, David Baumwohl, drafted two annexation agreements (the 1997 Agreements), which were essentially identical, with the exception the agreements referred to different, adjacent, undeveloped parcels. One of the parcels was owned by Peter Geris and his wife, Karen Geris, (Geris) and the other parcel was owned by Kenneth Sample doing business as Inyo Crude, Inc. and Kenneth Sample's wife, Carole Sample (Sample).[1] Arbors's property is comprised of these two parcels (the Property).

In the process of drafting and executing the 1997 Agreements, MMWC obtained a California Department of Corporations (DOC) permit for issuance of two shares of water stock for the Property (one share per parcel). The two water shares were needed for building a public storage facility, gas station, car wash, and mini mart, which Geris and Sample (Geris/Sample) jointly planned to build on the Property. The Department of Corporations (DOC) permit, dated December 30, 1996, allowing MMWC to issue two water shares, was valid for one year.

On January 2, 1997, Geris/Sample executed the 1997 Agreements. By letter dated May 22, 1997, MMWC's attorney, Baumwohl, retained Inyo-Mono Title Co. (IMT) to assist Geris/Sample in carrying out the provisions of the 1997 Agreements. Attached to

---

[1] On May 8, 2002, Inyo Crude, Inc. conveyed the property to Kenneth Sample and his wife, Carole Sample.

4

Baumwohl's letter requesting IMT to open escrow, were the two original 1997 Agreements signed by Geris and Sample. Baumwohl instructed IMT that, after Geris/Sample complied with all of the terms and conditions under the 1997 Agreements, IMT was authorized to record the 1997 Agreements.

Baumwohl listed in his May letter the conditions Geris/Sample were required to perform before IMT could record the 1997 Agreements. Those conditions included: (1) the MMWC board of directors (Board) approving and ratifying the 1997 Agreements; (2) MMWC obtaining the necessary DOC permits to issue two new water shares to Geris/Sample, which would be deposited with IMT and delivered by IMT to Geris/Sample simultaneously with recording; (3) before closing, Geris/Sample depositing with IMT payment of IMT's fees and MMWC's costs incurred in connection with the annexation; (4) issuance of a title insurance policy insuring the utility easements granted by Geris/Sample to MMWC; and (5) Geris/Sample complying with the conditions stated in paragraph 3 of the 1997 Agreements, with compliance confirmed in writing by MMWC, before the 1997 Agreements were recorded. IMT was to record the easements simultaneously with recording the 1997 Agreements.

Paragraph 3 of the 1997 Agreements contained the following conditions precedent to receiving water: (1) Geris/Sample recording a Notice of Completion of all delivery and water storage systems by Geris/Sample; (2) MMWC's approving of all items on the Property for water distribution, supply, and delivery, (3) Geris/Sample paying MMWC all fees, costs, expenses, and reimbursements incurred in connection with the 1997 Agreements; and (4) Geris/Sample granting MMWC the required utility easements.

5

In October 1997, IMT notified Baumwohl that IMT had not heard from Geris/Sample. Baumwohl contacted Peter Geris, who informed him that Geris/Sample was not going forward with the original project but was working on plans to develop a hotel on the Property. Baumwohl then notified IMT of these circumstances and informed IMT that, if the hotel project went forward, the 1997 Agreements would be modified, primarily due to the increased need for water. Baumwohl further advised that "the parties" had instructed that the matter be placed on hold "until we see what Peter Geris is going to do with his property." Geris testified at his deposition that he and Sample changed their plan for developing the Property, from building a gas station, storage facility, and mini-mart, to building a 40- and 61-unit hotel. However, Geris/Sample ultimately decided not to proceed with the hotel project because they could not find a hotel company willing to join in the project. Sample testified at his deposition that the terms of the 1997 Agreements were never carried out because the Property was sold.

The DOC permits for issuance of two MMWC water shares expired in December 1997, with no new shares of MMWC issued, and the 1997 Agreements were never recorded. Due to a lack of activity, IMT discarded its escrow file for the Property annexation, along with the two original 1997 Agreements.

*New Residential Project Plan and Attempt to Annex Property*

Almost five years later, in August 2002, Peter Geris approached MMWC to request water shares and a Will Serve Letter for water service for a new project plan to develop the Property. The new project was for a 22-unit residential development requiring 23 shares of water for 23 lots, which included one lot for the common area. In

August 2002, Peter Geris sent Jim Orr, president of MMWC, a letter stating he was applying for a zone change for the Property and therefore needed to designate who would provide water for the Property. Peter Geris requested to meet with the MMWC Board to discuss "the possibility of annexation" for purposes of obtaining water from MMWC. Although he preferred to obtain water from MMWC, as a backup plan, Peter Geris was considering developing his own water well system. Peter Geris wanted MMWC to provide the county planning department with a Will Serve Letter by November 2002, confirming that MMWC would provide water service for the Property. Peter Geris testified during his deposition that he wrote the August 2002 letter because he wanted MMWC to give him a concrete water connection fee amount for his project. Otherwise he was going to build his own well.

In December 2002, the MMWC Board met and approved providing water service for Geris/Sample's 22-unit condominium project, with a connection fee of $115,000. By letter dated December 6, 2002, James Orr, president of MMWC, notified the county planning department and Geris/Sample that the MMWC Board had recently agreed to provide water service for Geris/Sample's proposed 22-unit residential project on the Property, conditioned upon Geris/Sample submitting engineering plans to MMWC, MMWC approving the plans, and the recording of the final map for the Property, Tract Map No. 238.

*Arbors's Purchase of the Property*

In September 2004, Geris/Sample sold their property to Arbors. Blaine Hansen (Hansen) testified at his deposition that he formed Arbors, a limited liability company,

7

and purchased the Property for the sole purpose of continuing with the development of the 22-unit residential project. Hansen Construction Company, Inc. (Hansen Construction) is the sole member of Arbors, and Hansen is the sole owner and principal of Hansen Construction.

At the time of purchase of the property, Hansen was aware that Geris/Sample had entered into agreements with MMWC for water for the Property. However, Hansen was unaware of the 1997 Agreements. Hansen testified that he did not see the 1997 Agreements until during Peter Geris's deposition in March 2008, after the instant complaint was filed in July 2007. He never saw the original 1997 Agreements, only copies. Sample testified he never discussed the 1997 Agreements with anyone at Arbors or provided anyone at Arbors with a copy of the 1997 Agreements when the Property was sold.

In November 2004, Hansen met with MMWC's Board members for the purpose of determining the connection fee. The Board indicated that MMWC would provide water service and issue 23 water shares, conditional upon Arbors paying a $115,000 connection fee, MMWC's approval of the project's water improvement plans, MMWC's approval of completion of the improvements by MMWC's engineer, and recording and approval of the final tract map 238 by the county. By letter dated January 26, 2005, from James Orr of MMWC to Hansen, MMWC confirmed that it would issue 23 shares of water stock, subject to the enumerated conditions precedent.

The MMWC Board met in February 2005, discussed providing water for the Arbors residential project, and sent Hansen a letter in March 2005, clarifying the January

8

26, 2005 letter and additional factors. Specifically, the letter stated that the connection fee was $115,000, it was to be paid before recordation of the final tract map, and Hansen was to file the map within two years (by March 2, 2007). If this did not occur, MMWC would reevaluate its agreement and understanding. In September 2005, Hansen paid the $115,000 connection fee.

In November 2005, MMWC sent property management company, VierraMoore, Inc. (VierraMoore), a Will Serve Letter, stating that water would be provided to 22 lots on the Property and that Arbors had paid a $115,000 connection fee. A final tract map was recorded with the Inyo County Recorder in April 2006.

In June 2006, MMWC sent a letter to the DOC, inquiring as to how to apply for DOC approval of the 23 water shares for the Arbors project. Meanwhile, in 2006, Hansen, through his attorneys, wanted to expedite annexation of the Property for purposes of obtaining water for the project. By letter dated November 27, 2006, Baumwohl told Hansen's attorney, H.L. Koelewyn, that the MMWC Board had agreed to work with Koelewyn in completing the requirements necessary to annex the Property and obtain DOC permits for water shares. Baumwohl noted that Geris/Sample had previously entered into agreements to annex the Property and obtain two shares for their planned project. Baumwohl explained in the letter that Geris/Sample abandoned their project and effort to obtain two water shares, resulting in the DOC permits for two water shares expiring.

Baumwohl further stated in his letter that he understood that Arbors wanted the Department of Real Estate (DRE) to issue a White Report, which required Arbors to enter

9

into an annexation agreement with the MMWC. Baumwohl enumerated the terms and conditions that would be included in such an agreement. The annexation agreement would be drafted after negotiating the terms of the agreement with Koelewyn and after Arbors provided a deposit to cover the anticipated expenses.

Rather than complying with Baumwohl's instructions, Koelewyn suggested circumventing the requirements outlined in Baumwohl's letter by MMWC providing (1) a Certificate of the State Director of Health Services and (2) a signed statement by an engineer or from a public agency confirming the Property water supply and distribution system had been examined and tested. These items were required for the DRE to issue a White Report. Baumwohl responded that he had requested and would provide the two items Koelewyn requested, but noted Arbors had failed to provide the items he had requested. Baumwohl noted that Arbors was requesting 23 water shares and this required a DOC permit. Application for the permit required Arbors to comply with the items enumerated in Baumwohl's November 2006 letter.

In January 2007, Koelewyn told Baumwohl, he had still not received the requested health certificate or engineering report. Koelewyn further stated that Arbors had paid the $115,000 connection fee and constructed a water system, as required. Therefore Arbors was entitled to 23 water shares, as promised. The only remaining condition was MMWC's approval of the utility easement, which was in MMWC's possession. Koelewyn claimed MMWC was delaying signing the easements in an attempt to delay recording the map, which, in turn, prevented issuance of the water stock. Koelewyn concluded in his letter that Arbors had fully performed its part of the bargain and

10

therefore MMWC was required to issue the promised water shares. Delay in doing so was jeopardizing Arbors's financing.

In response, Baumwohl provided Koelewyn with the requested health certificate and engineering report. Baumwohl explained that MMWC could not issue the water stock until it obtained permits from the DOC. This required Arbors to comply with various requirements, previously enumerated, which Arbors had not addressed. Koelewyn claimed Arbors had complied with all required terms and conditions and, contrary to Baumwohl's assertion, Arbors was not required to pay for fees and costs involved in obtaining the DOC permits. Koelewyn added that Arbors would "execute an annexation agreement if the terms are reasonable."

By letter dated January 19, 2007, Baumwohl responded that it appeared that Arbors believed MMWC's January 26, 2005 letter constituted an agreement to supply Arbors with 23 water shares. Baumwohl stated that there was only a "tentative agreement," in which there was an understanding that, (1) if Arbors paid the $115,000 connection fee, MMWC would provide water service, (2) the understanding was subject to compliance with the law and satisfaction of all applicable conditions precedent before water shares would be issued and water service provided, and (3) the parties must reach agreement on completing the required tasks and satisfying the conditions precedent. Baumwohl noted that Koelewyn had enclosed with his previous correspondence a copy of a letter from MMWC to Geris/Sample, dated December 6, 2002. Baumwohl asked why the letter was relevant, noting that Geris/Sample had entered into the 1997 Agreements for two water shares but the 1997 Agreements were never recorded or

11

carried out. Baumwohl said that it was MMWC's understanding Geris/Sample abandoned their project in late 1997.

Baumwohl further stated in his letter: "We have no information regarding any further developments between Geris/Sample and the Water Company from late 1997 until the December 6, 2002 letter. It appears by way of that letter that Geris/Sample were starting the process for a new project indentified as Tentative Tract Map No. 238. In connection therewith, they were seeking a commitment from the Water Company to supply water. [¶] Nothing happened for almost two years, and the Water Company sent a letter to Geris referencing the Arbors project, dated October 29, 2004." Arbors became involved in the project thereafter.

Baumwohl notes in his lengthy, detailed letter that there was no express agreement between Arbors and MMWC concerning the nature, extent, and scope of initial and ongoing obligations of Arbors and MMWC. He concludes that "There must be an express agreement between the parties dealing with the necessary issues . . . . [T]his is why we have proposed the comprehensive Annexation Agreement." Baumwohl explained that MMWC would have to amend its Articles of Incorporation to provide for the 23 shares, and this required shareholder approval. Before this could occur, the parties were required to enter into an annexation agreement. Then MMWC could apply for permits for issuance of water shares from the DOC.

According to Baumwohl, MMWC was willing to assist Arbors in annexing its property for water service. Any existing agreement between the parties was tentative and required shareholder approval. MMWC was willing to share the necessary administrative

costs with Arbors. In the alternative, MMWC was willing to rescind the tentative agreement and return the connection fee funds to Arbors or mediate the matter with a professional mediator. Baumwohl thanked Arbors for its willingness to enter into an annexation agreement, which Baumwohl would begin drafting immediately, with Koelewyn's input.

Koelewyn responded that, "With regard to the annexation, my client has no objection to an annexation with reasonable provisions presumably as set forth in the Amendment to the CC&R's." In February 2007, Baumwohl informed Koelewyn that MMWC had authorized going forward with drafting an annexation agreement. Baumwohl reiterated that the parties currently only had a "tentative agreement." Baumwohl also stated that, although it was previously believed MMWC shareholder approval was required for issuance of the 23 water shares, Baumwohl discovered this was not necessary.

In March 2007, Baumwohl provided Koelewyn with a draft annexation agreement for review. In April, Baumwohl sent Koelewyn a letter stating he had not received any response from Koelewyn regarding the draft annexation agreement. Baumwohl said he had heard that Hansen had said there was "no way" he was going to sign the agreement and, if the water stock was not delivered, he would sue. Baumwohl advised Koelewyn that Arbors was legally required to enter into a written agreement containing the material terms and provisions set forth in the proposed annexation agreement before MMWC could apply for DOC permits and issue water stock. Since Hansen was not willing to cooperate and execute an annexation agreement, Baumwohl concluded there was nothing

13

MMWC could do to assist Arbors with its project. MMWC therefore refunded the $115,000 connection fee. Baumwohl stated there currently was no enforceable agreement to issue water shares. Nevertheless, MMWC was willing to resume the process of providing Arbors with water service, but not unless the parties entered into an annexation agreement.

In May 2007, Koelewyn sent property management company, VierraMoore, a letter advising that the following letters constituted an agreement between MMWC and Arbors, requiring MMWC to issue stock and provide water:

1. Letter dated December 6, 2002, from MMWC to Inyo County Planning Department, stating that the MMWC board had agreed to provide water service for the 22-unit project, subject to various conditions precedent.

2. Letter dated December 6, 2002, from MMWC, notifying Geris/Sample that the connection fee would be $115,000 for the 22-unit project.

3. Letter dated January 26, 2005, from MMWC to Hansen, in which MMWC confirmed that it would issue 23 shares of water stock, subject to certain conditions precedent.

4. Letter dated July 21, 2005, from MMWC to Inyo County Planning Department, stating that Hansen was required to pay MMWC a $115,000 connection fee prior to recordation of final tract map No. 238.

5. Letter dated December 2, 2005, from Hansen to MMWC, stating that Hansen had paid the $115,000 connection fee.

6. Letter dated December 13, 2005, from MMWC to Hansen, acknowledging

14

receipt of payment of the $115,000 connection fee.

In May 2007, Koelewyn also sent Baumwohl a letter stating that he had been out of the country and Hansen had not refused to sign the annexation agreement. Rather, Hansen wanted the annexation agreement to comport with the terms stated in the letters from MMWC to Hansen, Geris, and the county planning and water departments. Koelewyn asserted that Arbors had fully complied with the agreed upon terms and MMWC had failed to perform as promised. Arbors had no intention of allowing MMWC to rescind its agreement. Koelewyn provided Baumwohl with a revised annexation agreement. Thereafter, the parties attempted to negotiate the terms of the annexation agreement, to no avail.

In June 2007, Baumwohl sent Koelewyn a letter declaring that the parties had reached an impasse because Arbors did not want to include in the annexation agreement a General Release and Waiver of Claims provision. As a consequence, Hansen could not get a White Report,[2] which required establishing water service for the Property. In turn, Hansen could not build homes on the Property, which led to foreclosure in April 2010.

*Original Complaint*

On July 16, 2007, Arbors filed a verified complaint against MMWC, alleging causes of action for (1) specific performance, (2) damages based on breach of contract,

---

[2] A White Report, also known as a White Paper, is a Final Subdivision Public Report issued by the Real Estate Commissioner. (*Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC* (2012) 205 Cal.App.4th 999, 1006; *Sequoia Park Associates v. County of Sonoma* (2009) 176 Cal.App.4th 1270, 1292; *ABI, Inc. v. City of Los Angeles* (1984) 153 Cal.App.3d 669, 675-676; Bus. & Prof. Code, § 11018.2.)

15

and (3) injunctive relief. Arbors's original verified complaint alleged that Geris entered into an annexation agreement for water with MMWC in 1997, but Peter Geris changed the development project. Geris and MMWC entered into a letter agreement dated December 6, 2002 (attached to the complaint), in which Geris was to pay a $115,000 connection fee and MMWC agreed to annex the Property, provide water, and issue 23 shares of stock. In late 2004, Arbors purchased the Property. Before purchasing the Property, Arbors confirmed with MMWC that MMWC would provide water service to the Property, conditioned upon payment of a $115,000 connection fee. Arbors entered into an agreement with MMWC that MMWC would provide water to the Property, annex the Property for water service, and issue 23 shares of stock to Arbors, conditioned upon Arbors fulfilling various conditions precedent. The agreement was evidenced by letters dated January 26, 2005, and March 2, 2005, from MMWC to Hansen. Arbors complied with the conditions precedent. MMWC allegedly breached the agreement by failing to do what was necessary for issuance of the water shares and annexation of the Property for water service.

*First Amended Complaint*

In October 2008, the trial court granted Arbors leave to amend the complaint. Hansen Construction was added as a coplaintiff and MMWC Board members, James Orr and Andrew Holmes, were added as defendants. The amended complaint was founded entirely on the 1997 Agreements, as opposed to the alleged letter agreements relied on in the original complaint.

16

After several demurrers and motions to strike, the fifth amended complaint (FAC) became the operative complaint.

*Demurrer to Fifth Amended Complaint and Summary Judgment*

The fifth amended complaint against MMWC, Orr, and Holmes, alleged the following causes of action: (1) breach of contract, (2) breach of fiduciary duty of director toward subscriber, (3) fraud in performance of annexation agreement, (4) tortious interference with contractual relations, and (5) breach of the covenant of good faith and fair dealing. Arbors alleged that in 2002, the owners of the Property changed the proposed development plan for the Property. MMWC approved the change in 2002 and determined that 23 water shares would be required. The 1997 Agreements were intended to inure to the benefit of successor owners of the Property, such as Arbors.

Arbors further alleged that, on January 25, 3005, MMWC confirmed that Arbors was entitled to receive performance of the 1997 Agreements, which became effective immediately upon execution, without recordation. MMWC was required to qualify and issue 23 shares of water stock to Arbors, and deliver water to the Property, subject to conditions precedent, which Arbors had performed. MMWC breached the 1997 Agreements by failing to apply for DOC stock permits, failing to provide the shares to Arbors, repudiating the 1997 Agreements in January 2007, refusing to perform the 1997 Agreements in April 2007, and interfering with Arbors's performance under the 1997 Agreements, including causing a delay in preparation of a required easement. Plaintiffs further alleged that defendants breached their fiduciary duty to Arbors under the 1997 Agreements, as a subscriber of MMWC stock, and committed fraud by concealing their

17

intent not to perform the 1997 Agreements and deceiving Arbors as to defendants'

nonperformance. In addition, Arbors alleged in the fourth cause of action that defendants

interfered with Arbors's agreements with third parties to develop the Property, sell the

units, and obtain financing and insurance.

The trial court overruled defendants' demurrer to the FAC, with the exception of

the demurrer to the fourth cause of action for tortious interference with contractual

relations. As to that cause of action, the court sustained the demurrer without leave to

amend.[3] After answering the FAC, defendants filed a motion for summary judgment or,

alternatively, summary adjudication. Arbors filed a cross-motion for summary

adjudication. The trial court granted defendants' motion for summary judgment, denied

Arbors's motion for summary adjudication, and entered judgment for defendants and

against Arbors. The trial court concluded it was undisputed Arbors had no claim arising

from, or standing under, the 1997 Agreements.

III

SUMMARY JUDGMENT STANDARD OF REVIEW

"[T]he party moving for summary judgment bears the burden of persuasion that

there is no triable issue of material fact and that he is entitled to judgment as a matter of

law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*), fn.

---

[3] Defendants' demurrers as to Hansen Construction's claims ultimately were all sustained without leave to amend, resulting in entry of a judgment of dismissal against Hansen Construction. This court affirmed the trial court judgment against Hansen Construction in a separate, prior appeal (*Hansen Construction, Inc. v. Meadowcreek Mutual Water Company, Inc.* (Oct. 18, 2012, E053620) [nonpub. opn.].) Hansen Construction is not a party to this appeal.

18

omitted.) "Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to that cause of action . . . ." (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar,* at p. 850.) The party opposing summary judgment "may not rely upon the mere allegations or denials of its pleadings," but rather "shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (§ 437c, subd. (p)(2).) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid.*) We affirm summary judgment where it is shown that no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) Where summary judgment has been granted, we review the trial court's ruling de novo. (*Aguilar,* at p. 860.)

IV

ENFORCEABILITY OF THE 1997 AGREEMENTS

The pivotal issue here is whether the 1997 Agreements were abandoned or modified before Arbors purchased the Property. We conclude Arbors has not provided evidence refuting that the 1997 Agreements were abandoned before Arbors purchased the Property. Arbors has thus not met its burden of establishing that a reasonable trier of fact would find that Arbors had enforceable rights under the 1997 Agreements.

In considering whether the 1997 Agreements were terminated or modified, we first look to the terms of the 1997 Agreements. Paragraph 2 of the 1997 Agreements state that "[t]he covenants, conditions, terms, and promises set forth herein are to run with the land

19

of OWNER and shall be binding upon and be a benefit to all parties and all persons or entities claiming under each of the parties *until termination of any such provision in writing by the parties or any persons or entities claiming under them*." (Italics added.) Similarly, modification of the 1997 Agreements also was required to be in writing. Paragraph 10.4 of the 1997 Agreements states: "Any modifications to this Agreement shall be of no force or effect unless made in writing and signed by the party to be charged."

Termination of a contract differs from modification of a contract in that, "[a]n 'alteration' is a modification or change in one or more respects which introduces new elements into the details of the contract, or cancels some of them, but leaves the general purpose and effect undisturbed. [Citations.] To 'terminate' a contract, on the other hand, means to abrogate so much of it as remains unperformed, thereby doing away with the existing agreement upon the terms and with the consequences agreed upon. [Citation.] This distinction has been frequently applied by the California courts, and it is now well settled that the termination or abrogation of a written contract may be achieved by an oral agreement, whether executed or not, and that in such a case section 1698 of the Civil Code has no application." (*Grant v. Aerodraulics Co.* (1949) 91 Cal.App.2d 68, 74-75.) Civil Code section 1698 provides that a contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise. (See also *Grant,* at p. 75.)

Here, it is undisputed MMWC and Geris/Sample did not execute any written agreement to terminate or modify the 1997 Agreements. The absence of such a written

20

agreement, however, does not preclude the possibility of extinguishment of the 1997 Agreements by abandonment. Abandonment differs from the parties expressly agreeing to terminate or modify the 1997 Agreements. "[A]bandonment requires a finding that *both* parties intended to disregard the contract, and abandonment may be implied from the acts of the parties. [Citations.]" (*C. Norman Peterson Co. v. Container Corp. of America* (1985) 172 Cal.App.3d 628, 643.) "'[A]bandonment requires a finding that *both* parties intended to disregard the contract.' ([*C. Norman Peterson Co. v. Container Corp. of America,*] at p. 643; *Ben-Zvi v. Edmar Co*. (1995) 40 Cal.App.4th 468, 474 ['Abandonment occurs . . . only where both contracting parties agree "that the contract is terminated and of no further force and effect"'].)" (*Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228, 236.)

Here, after entering into the 1997 Agreements, Geris/Sample substantially changed the scope of the development plan for the Property by proposing to build a 22-unit condominium project on the Property, which required 23 water shares. The original project required only two water shares and was a commercial development, rather than residential. Acknowledging this significant change, MMWC and Geris/Sample began negotiations and entered into a new tentative agreement for annexation and issuance of water stock, instead of modifying the existing 1997 Agreements. There is no evidence of Geris/Sample and MMWC relying on or modifying the 1997 Agreements in connection with the 22-unit residential project.

"""There can be no question that a contract can be mutually abandoned by the parties at any stage of their performance and each of the parties released from any further

21

obligation on account thereof; that it may be done by parol, and the fact of its having been done established by evidence of the acts and declarations of the parties.""" (*Martin v. Butter* (1949) 93 Cal.App.2d 562, 566.) Arbors has not presented any evidence refuting that the parties to the 1997 Agreements abandoned the agreements before Arbors purchased the Property. MMWC and Geris/Sample's acts and declarations establish that they were not relying on the 1997 Agreements when they discussed annexation and issuance of shares for the newly proposed development plan of building a 22-unit residential project on the Property. "While the question of abandonment is one of intention to be determined only upon an investigation of all the facts and circumstances, still where there is no dispute as to the facts or the inferences to be drawn therefrom the question becomes one of law." (*Herbert v. Graham* (1925) 72 Cal.App. 314, 316; *Templar Mining Co. v. Williams* (1937) 23 Cal.App.2d 45, 51.) Here, there is no dispute as to the material facts relevant to the determination of whether Geris/Sample abandoned the 1997 Agreements.

Arbors argues there is a triable issue of fact as to whether the 1997 Agreements were abandoned, because the 1997 Agreements do not include termination dates, there are no due dates for performance or completion, and there are no "time is of the essence" clauses. Therefore, a reasonable time for performance was permitted under the 1997 Agreements. Civil Code section 1657 provides: "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed. If the act is in its nature capable of being done instantly – as, for example, if it consists in the payment of money only – it must be performed immediately upon the thing to be done

22

being exactly ascertained." "What constitutes such a reasonable time ordinarily presents a question of fact, dependent upon the circumstances of the case. [Citation.]" (*Kotler v. PacifiCare of California* (2005) 126 Cal.App.4th 950, 956.)

"[T]he standard of reasonableness applicable in this case is a conventional one, derived from 'the situation of the parties, the nature of the transaction, and the facts of the particular case' [citation]." (*Kotler v. PacifiCare of California, supra,* 126 Cal.App.4th at p. 956.) Based on the terms within the four corners of the 1997 Agreements, as well as the undisputed facts of this case and nature of the transaction to provide water for the Property, we conclude the evidence would not allow a reasonable trier of fact to find the 1997 Agreements were performed within a reasonable time. (*Aguilar, supra,* 25 Cal.4th at p. 850.) The 1997 Agreements specify that "The parties shall use due diligence and their best efforts to annex the property of OWNER to the WATER COMPANY." Although not expressly stated, this suggests time was of the essence in performing the 1997 Agreements. Geris/Sample's inactivity for approximately five years cannot be said to constitute due diligence in carrying out the terms and conditions of the 1997 Agreements. Rather, such inactivity reflected abandonment, as concluded by IMT, the escrow company responsible for assisting Geris/Sample with annexation of the Property under the 1997 Agreements.

When IMT asked Baumwohl in October 1997 what the status was on annexing the Property, Baumwohl advised IMT that the matter was on hold because Geris/Sample was not going forward with the original project and was considering a new project of building a hotel on the Property. The hotel project also never went forward, because Geris could

23

not find a hotel company that would join in the project. Geris/Sample's efforts to annex the Property under the 1997 Agreements languished for several years. Because of this inactivity for a relatively lengthy period of time, IMT assumed Geris/Sample had abandoned their efforts to annex the Property under the 1997 Agreements. IMT discarded its escrow file for the Property annexation, along with the two original 1997 Agreements. The DOC permits for issuance of two MMWC shares also expired in December 1997, with no new shares of MMWC issued, and the 1997 Agreements were never recorded.

It was not until about five years later, in 2002, that Geris/Sample began negotiating a new annexation agreement for an entirely different project, which was a residential project, rather than a commercial project, and required 23 water shares instead of two water shares. There is no evidence indicating either MMWC or Geris/Sample relied on the 1997 Agreements or believed the 1997 Agreements remained binding and enforceable regarding the new project. This is apparent from evidence that, in August 2002, Peter Geris approached MMWC to request water shares and a Will Serve Letter for water for his new project plan to build 22 residential units. Peter Geris's letter to MMWC, dated August 29, 2002, stated that he was applying for a required zone change for the Property and therefore needed to designate who would provide water for the Property. Peter Geris requested to meet with the MMWC Board to discuss "*the possibility of annexation*" for purposes of obtaining water from MMWC. Peter Geris stated that he preferred to obtain water from MMWC but, as a backup plan, was considering developing his own water well system.

24

The August 2002 letter shows that Peter Geris did not believe the 1997 Agreements remained in effect or were still binding on the parties. Peter Geris indicated he was not required to annex the Property under the 1997 Agreements or receive water from MMWC. Geris/Sample were considering building their own water well in the event the connection fee and water service charges were too high. Geris testified during his deposition that he wrote the August 2002 letter because he wanted MMWC to give him a concrete, reasonable connection fee amount for his project. Otherwise Geris was going to build his own well. There is simply no evidence that the negotiations, discussions, and agreements between MMWC and Geris/Sample commencing in 2002, regarding the new 22-unit project, were founded on the 1997 Agreements. The parties did not mention the agreements and all communications indicated the parties intended to create a new annexation agreement.

Furthermore, Sample testified at his deposition that the terms of the 1997 Agreements were never carried out because the Property was sold. Sample also testified he never discussed the 1997 Agreements with Arbors or provided a copy of the 1997 Agreements to Arbors when the Property was sold. Hansen acknowledged he never even saw the 1997 Agreements until after he had filed the complaint in this case. Hansen testified he did not see copies of the 1997 Agreements until during Geris's deposition in March 2008. Furthermore, Hansen never saw the original 1997 Agreements, since IMT discarded them because of the parties' inactivity.

The instant lawsuit arose from a dispute between Arbors and MMWC over whether negotiations and letter agreements relating to the 22-unit project constituted an

enforceable agreement requiring MMWC to annex the Property and provide 23 water shares. Hansen initially argued that the letter agreements constituted a binding agreement to annex the Property and issue 23 water shares. MMWC argued there was no formal, signed agreement by the parties, which was legally required in order to annex the Property and provide water service. Eventually, Hansen agreed to consider executing an annexation agreement but then refused to sign the proposed annexation agreement drafted by Baumwohl, because the agreement included a General Release and Waiver of Claims provision, which Hansen did not want included in the annexation agreement.

When it became apparent that the parties could not resolve their differences, Hansen brought the instant lawsuit, which was founded on MMWC's 2002 and 2005 letters, stating that MMWC would agree to annexation and providing water service subject to the Property owner's compliance with various conditions precedent. It was not until almost a year after Hansen filed this action, that Hansen viewed a copy of the 1997 Agreements, retained a new attorney, and completely changed the theory of his case, and amended the complaint to allege that MMWC was contractually obligated to annex the Property, issue 23 water shares, and provide water service based on the 1997 Agreements.

Based on our review of the totality of the evidence, we conclude it is undisputed that Geris/Sample and defendants did not diligently attempt to annex the Property under the 1997 Agreements after Geris/Sample dropped their initial projects in 1997. Instead, for approximately five years, Geris/Sample discontinued their efforts to annex the Property. There is no evidence showing that, when they initiated efforts to annex the

26

Property for water service in 2002, either MMWC or Geris/Sample had any intention of relying on or modifying the 1997 Agreements in connection with the new 22-unit project. The undisputed evidence shows that, as a matter of law, Geris/Sample and MMWC abandoned the 1997 Agreements by nonaction and a lack of due diligence in performing the 1997 Agreements' terms and conditions. The evidence further demonstrates that in 2002, Geris/Sample initiated completely new negotiations for annexation and water service for the 22-unit project, and the negotiations were not in any way founded on the abandoned 1997 Agreements.

Arbors argues it has standing to enforce the 1997 Agreements terms and conditions as a successor-in-interest and assignee of Geris/Sample's interest in the Property. Paragraph 2 of the 1997 Agreements state that "It is the express intent of the parties hereto that the covenants, conditions, promises, and obligations set forth herein be made for the express benefit of the WATER COMPANY, its shareholders, and the properties benefitted by the creation and existence of the WATER COMPANY, and with the express intent to bind and benefit OWNER, the property of OWNER, *and the successors-in-interest, heirs, and assigns* of each of the parties hereto. The covenants, conditions, terms, and promises set forth herein are to run with the land of OWNER and shall be binding upon and be a benefit to all parties and all persons or entities claiming under each of the parties . . . ." (Italics added.) Paragraph 10.5 of the 1997 Agreements states: "This Agreement shall be binding upon and inure to the benefit of the . . . successors, and assigns of each of the parties hereto."

27

These provisions do not provide Arbors with standing or rights under the 1997 Agreements because the 1997 Agreements were extinguished through Geris/Sample's abandonment of the 1997 Agreements before the Property was sold to Arbors in 2004. Since at the time of Arbor's purchase of the Property, Geris/Sample had no enforceable contractual rights under the 1997 Agreements, Arbors likewise, as a matter of law, received no contractual rights under the abandoned 1997 Agreements and was never a party to the 1997 Agreements. Arbors thus has no standing to enforce the abandoned, extinguished 1997 Agreements.

All other issues raised in Arbors's appeal, such as whether the 1997 Agreements were unenforceable because they were not recorded, whether the covenants in the 1997 Agreements ran with the land, whether the 1997 Agreements were enforceable even assuming the covenants did not run with the land, whether Arbors fully performed all of the conditions precedent required under the 1997 Agreements, and whether Arbors was required to comply with Corporations Code section 14312,[4] are moot and therefore need not be addressed in this decision because Arbors's entire complaint is founded on the 1997 Agreements, which we conclude are unenforceable as a matter of law, since

---

[4] Corporations Code section 14312, subdivision (a), provides in relevant part: "(a) Any person who intends to offer for sale or lease lots within a subdivision within this state and to provide water for domestic use to purchasers of the lots within a subdivision through the formation of a mutual water corporation described in Section 14311, shall include as part of the application for a public report, as described in Section 11010 of the Business and Professions Code, a separate document containing all of the following information, representations, and assurances . . . ."

28

Geris/Sample abandoned the agreements.  Also, as a nonparty to the 1997 Agreements, Arbors has no standing to enforce the 1997 Agreements.

Arbors has not established any disputed material issue of fact.  It is unrefuted that Arbors cannot prevail on any of its causes of action, which are all founded on the abandoned 1997 Agreements.  The trial court therefore appropriately granted summary judgment against Arbors.

V

DEMURRER TO THE FOURTH CAUSE OF ACTION

In July 2007, Arbors filed a verified complaint alleging breach of contract.  The alleged contract was memorialized in five letters attached to the complaint, which Arbors alleged formed an agreement that MMWC would provide water services for the Property. In October 2008, the trial court granted Arbors leave to amend the complaint.  The first amended complaint and subsequent amended complaints were founded on the 1997 Agreements, instead of the contract allegedly derived from the five letters attached to the original complaint.

After several additional demurrers and motions to strike, the FAC became the operative complaint.  The trial court overruled defendants' demurrer to the FAC, with the exception of defendants' demurrer to the fourth cause of action for tortious interference with contractual relations (interference with contract).  As to that cause of action, the

29

court sustained the demurrer without leave to amend.[5]  Arbors challenges the ruling in this appeal.

Arbors and Hansen Construction (plaintiffs) alleged in the fourth cause of action for interference with contract that Arbors entered into the following agreements to further the development and sale of units built on Arbors's property:  (1) a development loan agreement and a line of credit agreement between Arbors and Colonial Bank; (2) a policy of liability insurance issued to Arbors by Westchester Surplus Lines; (3) three purchase notes; and (4) reservation agreements with prospective purchasers of the units. Defendants allegedly knew of these third-party construction and development-related agreements, and interfered with the contracts by committing acts in breach of fiduciary duties and fraud in the performance of the 1997 Agreements.  The complaint alleges that "The allegations with respect to the Defendants' conduct apply to both Plaintiffs in the same way, and Plaintiffs ARBORS and HC properly join together as plaintiffs in this Cause of Action."

Plaintiffs further alleged in the fourth cause of action that defendants' alleged interference with Hansen's contracts included (1) thwarting Hansen's development of the Arbors project until Arbors was coerced into modifying the annexation agreements, (2) exploiting for the benefit of Triad and Holmes Associates, an undisclosed conflict of

---

[5]  Defendants' demurrers to Hansen Construction's claims ultimately were all sustained without leave to amend, resulting in entry of a judgment of dismissal against Hansen Construction.  This court affirmed the trial court judgment against Hansen Construction in a separate, prior appeal (*Hansen Construction, Inc. v. Meadowcreek Mutual Water Company, Inc.* (Oct. 18, 2012, E053620) [nonpub. opn.]).  Hansen Construction is not a party to this appeal.

30

interest of Holmes as an officer of both MMWC and Triad, (3) concealing defendants'
lack of performance of the annexation agreements, (4) concealing that MMWC lacked
the water shares needed to transfer to Arbors, (5) colluding with Triad and Holmes in
repudiating the annexation agreements, (6) delaying work required by MMWC for the
provision of water on the property, and (7) breaching the annexation agreements.

In Hansen Construction's separate appeal, this court affirmed the trial court's
ruling sustaining without leave to amend defendants' demurrer to the fourth cause of
action of the fifth amended complaint (*Hansen Construction, Inc. v. Meadowcreek
Mutual Water Company, Inc.* (Oct. 18, 2012, E053620) [nonpub. opn.].)  This court
concluded Hansen Construction had no standing as either a party or third party
beneficiary under the 1997 Agreements to maintain causes of action for breach of
contract and fraud in the performance of contract (the first and third causes of action).
We explained in our decision that nothing in the 1997 Agreements was intended to
benefit the builder, Hansen Construction.  Any benefits that Hansen Construction might
receive from developing the Property, would be incidental.

This court also concluded in our previous decision that Hansen did not allege
sufficient facts demonstrating that defendants knew about the third-party contracts or
intentionally interfered with them.  Hansen Construction argued the alleged acts of
intentional interference included defendants' concealment and collusion between
MMWC and Triad, with Holmes exploiting his role as an officer of both Triad and
MMWC.  We concluded that, as to interference with Hansen Construction's construction-
related contracts, the complaint made conclusionary allegations that defendants

31

intentionally interfered with those contracts without alleging any supporting facts. Hansen Construction also failed to allege any facts that it suffered damages from interference with each of the contracts. These same deficiencies in the fourth cause of action apply equally to Arbors.

## A. *Standard of Review*

We review de novo the trial court's rulings sustaining defendants' demurrers without leave to amend. (*Schauer v. Mandarin Gems of California, Inc.* (2005) 125 Cal.App.4th 949, 955.) "'[W]e give the complaint a reasonable interpretation, and treat the demurrer as admitting all material facts properly pleaded, but not the truth of contentions, deductions or conclusions of law. We reverse if the plaintiff has stated a cause of action under any legal theory. [Citation.]'" (*Ibid.*, quoting *Barnett v. Fireman's Fund Ins. Co.* (2001) 90 Cal.App.4th 500, 507.)

## B. *Analysis*

Arbors briefly, in two paragraphs, argues that the trial court erred in sustaining defendants' demurrer to the fourth cause of action. Arbors asserts that the fourth cause of action is proper because it is based on acts which are independent of the breach of contract between Arbors and MMWC. The fraud claim is based on defendants' alleged concealment of MMWC's failure to seek qualification of the water shares and concealment of defendants' intent to repudiate the 1997 Agreements. The breach of fiduciary duty is based on defendants' alleged collusion and exploitation of a conflict of interest by Holmes, who was on the MMWC Board while acting as Arbors's engineer.

This conflict allegedly enabled the engineering company and MMWC to conceal their wrongful conduct.

"The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. [Citations.]" (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126.)

As we concluded in Hansen Construction's separate appeal, plaintiffs did not allege sufficient facts demonstrating that defendants knew about the third-party contracts or intentionally interfered with them. As to interference with Arbors's construction-related contracts, Arbors has made conclusionary allegations that defendants intentionally interfered with those contracts but has not alleged any supporting facts. Arbors also has not alleged any facts that it suffered damages from interference with each of the contracts. Arbors's allegations of interference are premised on allegations incorporated from the second and third causes of actions, but those causes of action are premised on the 1997 Agreements, which Arbors had no standing to enforce.

## VI

## DISPOSITION

The judgment is affirmed.  Defendants are awarded their costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

MILLER
J.